Filed 1/9/15  P. v. Valdez CA5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F066139 |
| Plaintiff and Respondent, | (Super. Ct. No. VCF258018) |
| v. | |
| ROBERT ISRAEL VALDEZ, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Peggy A. Headley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Robert Gezi and Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Following a jury trial, appellant Robert Israel Valdez was convicted of premeditated attempted murder of Christopher Ince pursuant to Penal Code[1] sections 187, subdivision (a), and 664 (count 1); dissuading a witness from reporting a crime pursuant to section 136.1, subdivision (b)(1) (count 2); and dissuading another witness from reporting a crime pursuant to the same section (count 3). The jury also found true three firearm enhancements (§ 12022.53, subds. (b), (c) & (d)) and a great bodily injury enhancement (§ 12022.7, subd. (a)) associated with count 1, and a firearm enhancement associated with counts 2 and 3 (§ 12022.5, subd. (a)). Prior to the commencement of trial, Valdez admitted three prior prison term enhancements associated with all three counts.

For count 1, Valdez was sentenced to life in prison with the possibility of parole, plus a consecutive term of 25 years to life for one of the firearm enhancements (§ 12022.53, subd. (d)), plus three consecutive terms of one year each for the prior prison term enhancements (§ 667.5, subd. (b)). The court stayed the remaining enhancements under count 1.

For counts 2 and 3, Valdez was sentenced to the middle term of two years, plus a consecutive term of four years for the firearm enhancement (§ 12022.5, subd. (a)), with the sentences on counts 2 and 3 to run concurrently with the sentence on count 1. The court granted Valdez 462 days presentence credit for time actually served (402 days) and local conduct (60 days).

On appeal, Valdez raises five contentions. First, he argues he was deprived the effective assistance of counsel because his trial attorney employed an "all or nothing" trial strategy that was not objectively reasonable and his counsel then gave a closing argument that omitted critical points, contained factual errors, and did not reasonably

---

[1]     All future references are to the Penal Code unless otherwise noted.

2

deliver upon a promise to identify the inconsistencies within the prosecution witnesses' testimony. Second, he challenges the sufficiency of the evidence supporting the verdict on count 1. Third, he argues that his admissions to the three prior prison term enhancements were not voluntary and intelligent.

We find these three arguments unpersuasive.

Valdez also asserts that he is entitled to additional presentence credits for a total of 476 days of credit. Respondent concedes this point and we accept the concession. Finally, Valdez maintains that the abstract of judgment contains clerical errors in that it fails to show the stayed enhancements pursuant to section 12022.53, subdivisions (b) and (c), which must be corrected. Respondent also concedes this point, which we accept.

The judgment is modified to award Valdez a total of 476 days of presentence credits and further modified to reflect the stayed enhancements pursuant to section 12022.53, subdivisions (b) and (c). As so modified, the judgment is affirmed.

## FACTS

Valdez does not challenge the sufficiency of the evidence supporting the jury's verdicts in counts 2 and 3 for dissuading a witness under section 136.1, subdivision (b)(1). As such, set forth below are those facts relevant to count 1.

### Prosecution Evidence

At one time, Valdez and Ince were friends. On the day of the shooting, they had known each other for about four or five years. On occasion, Valdez had stayed at the Ince residence in Porterville.

Ince's wife had a medicinal marijuana card and she was growing seven marijuana plants in the days leading up to the shooting. Multiple times before the shooting she noticed Valdez in their backyard near the marijuana plants where he "shouldn't have been." Valdez would come around at nighttime and go straight into Ince's backyard

3

without knocking on the front door. Ince's wife told Ince about her concerns regarding Valdez's behavior.

Ince also began to have doubts about Valdez after he showed up early one morning at the Ince residence. The Ince's were concerned that Valdez intended to steal the marijuana, so Ince began to sleep in a tent in the backyard to protect his wife's garden.

On September 20, 2011, Valdez drove to Ince's home and spoke with Ince on his front porch. Ince told Valdez that he was not welcome in their home anymore because Valdez had twice tried to steal marijuana plants.

Dillon Bowen, Brandon Bowen and Nathan Eastep were sitting outside the neighboring residence and they witnessed part of the interaction. Another witness, Zachary Lonero, was getting dressed inside that neighboring residence, but came outside in time to see part of the confrontation.

To some of the witnesses, it appeared that Valdez and Ince were arguing or yelling. The argument appeared to be about marijuana and Dillon Bowen later told a sheriff's deputy that he heard Valdez claim the crop was his when he confronted Ince. Lonero heard Ince telling Valdez to leave. The exchange between Valdez and Ince did not last very long. Valdez cursed at Ince and walked back towards his truck.

The witnesses varied in their testimony regarding where Valdez's truck was parked. Brandon Bowen testified that the truck was parked in Ince's driveway. Eastep, however, testified that Valdez initially pulled into Ince's driveway but pulled away and parked on the street before he began arguing with Ince. Dillon Bowen testified that Valdez parked "with the truck to the curb" near the road before he argued with Ince. Ince could not see the truck from his porch.

At his truck, Valdez removed a rifle from behind the seat. Three of the witnesses identified the rifle as a .22-caliber. Valdez walked back towards Ince and aimed the rifle.

4

The witnesses all ran for cover once they realized that Valdez had the rifle and was confronting Ince.

The testimony varied regarding how close Valdez was to Ince when he aimed the rifle. Ince testified that Valdez "approached my porch" with the rifle. Eastep saw Valdez walking back towards Ince with the rifle but did not describe how close Valdez came to Ince. Dillon Bowen gave the strongest indication when he testified that Valdez walked back towards Ince and stood with the rifle "by the porch" and "on the concrete that goes ... up to the porch." A sheriff's deputy, however, testified that Dillon Bowen had indicated on the day of the shooting that Valdez remained at his truck while he argued with Ince, who remained near the front of his residence. The deputy estimated the distance to be 40 or 50 feet from where Dillon Bowen believed Valdez to be standing from Ince when they argued and then Valdez started firing.

When Ince saw Valdez aim the rifle at him, he tried to jump inside his residence, but he realized he did not have enough time. Ince testified that, "I motioned my body to take the shot." He further said, "I just kind of cringed up, leaned to the right so I could take the shot in my right side, because I knew it was coming." Valdez shot Ince one time in the right side of his chest at approximately 12:20 p.m.

After running for cover, most of the witnesses heard multiple shots fired. Brandon Bowen testified that he heard "a couple" of gunshots and he told a sheriff's deputy on the day of the shooting that that he heard "four to five" gunshots. Dillon Bowen testified that he heard a "few" shots and he told a deputy on the day of the shooting that Valdez fired approximately four or five shots. Lonero told a deputy on the day of the shooting that he heard "two to four gunshots[]" but at trial he testified to hearing only one shot.

After shooting Ince, Valdez went back to his truck. Before leaving, Valdez pointed his rifle at Eastep, who had returned outside and was standing between Valdez

and Dillon Bowen with a phone to his ear. Valdez stated, "You better not be calling the cops." After having trouble starting the engine, Valdez drove away.

Ince went inside his house and looked out a bedroom window to confirm Valdez had left. After Valdez left, Ince went back outside and collapsed on or near his porch, bleeding from his torso. The witnesses rushed to Ince's side, and called for law enforcement and an ambulance.

Deputies from the Tulare County Sheriff's Department arrived at the scene and located a live (unfired) .22-caliber round lying on the road just off the curb in front of Ince's residence. The deputies, however, did not find any bullet holes in Ince's home, on his porch, in his door, or anywhere on his property. There was no evidence of shots fired other than Ince's injury. Although .22-caliber rifles generally "kick out" spent rounds, deputies did not find any spent rounds in the area of the shooting. However, Lonero told a deputy that he witnessed Valdez "picking up objects from the ground in front of [Ince's] residence" and, although he was not sure what those objects were, it "may have been spent shell casings from the rifle that [Valdez] had fired."

In the hospital, Ince told a deputy that Valdez shot him, and Ince identified Valdez from a six-pack photographic lineup. Ince also told a deputy that another person, David Seaman, was at his house during the incident. At trial, however, Ince testified that Seaman was not at his (Ince's) house when the shooting occurred, but he believed Seaman was next door at the neighboring house.

Ince suffered a collapsed lung and required 12 days of hospitalization. The doctors did not remove the bullet from Ince's body over concern it would cause more complications.

Hours later on the day of the shooting, Ince's uncle saw and recognized Valdez as Valdez entered a liquor store in Strathmore. Ince's uncle had been told earlier that Valdez shot Ince. Valdez was grabbed and held until sheriff deputies arrived and

apprehended him sometime after 9:00 p.m. that same day. At around midnight, deputies located Valdez's truck in Strathmore, searched it and found two live .22-caliber rounds.

On the day of the shooting, Brandon Bowen, Dillon Bowen, Eastep and Lonero all identified Valdez as the shooter in a photo lineup. At trial, Ince identified Valdez as his shooter and three of the witnesses identified Valdez as the only person who had a gun before shots were fired.

### *Defense Evidence*

Valdez testified on his own behalf. He described Ince as a "buddy" and went to Ince's house in the morning on September 20, 2011, to pick up some belongings. Once there, Ince gave him some of clothes and a jacket, but Ince told him he had to leave because Ince's father did not want Valdez on the property. Valdez left Ince's house without any argument or dispute occurring. There was no issue regarding marijuana. Before leaving, Valdez saw Seamen at Ince's house. Valdez also saw the witnesses at the neighboring residence while he was at Ince's house.

After leaving Ince's house, Valdez went to his sister's house and then assisted someone at the Farmers Market gas station in the afternoon, around 12:00 p.m. or 12:30 p.m. He was at the gas station for a "good 30-45 minutes" before he drove that same individual to a walnut field, where the individual worked. While at the walnut field, Valdez asked for potential employment from an individual named "Nacho".

After leaving the walnut field, Valdez went back to Porterville to visit a friend whom he had not seen in a while. His friend was not home so Valdez spoke with the friend's girlfriend, waited for 20 minutes and left. He went back to Porterville to his wife's house where he talked to his brother-in-law. Valdez started to drink and smoke marijuana. Valdez then went to Strathmore, ran out of gas, and saw Ince's uncle in the Strathmore Liquor Store. Valdez went inside the store to ask for help, and Ince's uncle and another man "assaulted" him before sheriff deputies arrived and arrested Valdez.

7

After he was taken into custody, Valdez informed sheriff deputies that he had been at the Farmers Market gas station. He also told deputies about the walnut field and talking to Nacho. Valdez stated that he "begged" the deputy to go to the Farmers Market and check the surveillance to show he was not the shooter. Deputies, however, never checked the surveillance system.

Valdez told the jury that he did not shoot Ince. He stated that all of the witnesses were lying about seeing him shoot Ince. He also said Ince's wife lied about seeing him in her marijuana plants.

**DISCUSSION**

I. VALDEZ WAS NOT DEPRIVED THE EFFECTIVE ASSISTANCE OF COUNSEL

Valdez contends that his convictions should be reversed and he be granted another trial because he was deprived of the effective assistance of counsel. He argues he was prejudiced due to "a breakdown in the adversarial process that our system counts on to produce just results." (*Strickland v. Washington* (1984) 466 U.S. 668, 696.)

We find Valdez's arguments to be without merit.

A. <u>Standard of Review</u>

Under the federal and state constitutions, a criminal defendant is entitled to the assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The constitutional right is a guarantee "not to some bare assistance but rather to *effective* assistance." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215, original italics.) To prevail on a claim of ineffective assistance of counsel, a defendant must establish two criteria: (1) that counsel's performance fell below an objective standard of reasonable competence and (2) that he was thereby prejudiced. (*Strickland v. Washington, supra,* 466 U.S. at pp. 687-688; *People v. Mayfield* (1997) 14 Cal.4th 668, 783-784.) The defendant has the

8

burden of showing both deficient performance and resulting prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

Regarding the first criterion, the appellate court is to defer to counsel's reasonable tactical decisions, and there is a strong presumption that counsel's conduct falls within the range of reasonable professional assistance. (*People v. Lucas, supra,* 12 Cal.4th at p. 436.) An appellate court will reverse the conviction "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.) In conducting this review, the appellate court considers whether the record contains any explanation for counsel's actions; if the record sheds no light on counsel's actions, the claim is not cognizable unless counsel was asked for an explanation and failed to provide one, or unless there could be no satisfactory explanation for the actions taken. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; *People v. Kelly* (1992) 1 Cal.4th 495, 520.)

Regarding the second criterion, a defendant must establish a reasonable probability that, but for counsel's unprofessional error, the result would have been different. (*Strickland v. Washington, supra,* 466 U.S. at p. 694; *People v. Samayoa* (1997) 15 Cal.4th 795, 845.) A reasonable probability is "a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra,* at p. 694.)

Where a claim of ineffectiveness may be rejected due to lack of prejudice, that course should be followed. (*In re Scott* (2003) 29 Cal.4th 783, 825; *In re Cox* (2003) 30 Cal.4th 974, 1019.)

B.    Defense Counsel's Trial Tactics

Valdez contends that his own testimony about not shooting Ince did not prevent his trial counsel from making "back-up arguments" and informing the jury that if they rejected Valdez's testimony there was still insufficient evidence of specific intent to kill and insufficient evidence of premeditation. Valdez also argues that his counsel was

9

ineffective because he did not request any jury instructions for lesser related offenses, such as assault with a firearm (§ 245, subd. (a)(2)) or grossly negligent discharge of a firearm (§ 246.3, subd. (a)).

A failure to raise a potentially meritorious defense can deny a defendant the effective assistance of counsel, and a crucial defense is not necessarily one that, if presented, would result in defendant's acquittal. (*People v. Farley* (1979) 90 Cal.App.3d 851, 865.) However, counsel is not necessarily incompetent for presenting a defense that had no hope of success because "[m]any defenses are hopeless, or nearly so." (*People v. Scott* (1997) 15 Cal.4th 1188, 1215 [rejecting argument that defense counsel was incompetent for presenting defense that had no hope of success].)

Here, defense counsel could have reasonably decided as a matter of tactics to fully support Valdez's testimony, or what appellant describes as an "all or nothing" trial strategy. Indeed, in his closing arguments, defense counsel reminded the jury that Valdez testified he was elsewhere at the time of the shooting and counsel noted that law enforcement failed to investigate Valdez's alibi. Defense counsel also argued that Seaman was present during the shooting, but Seaman was never questioned or interviewed regarding his role. Defense counsel could have reasonably decided that to argue in the alternative, that Valdez shot Ince but did so without intent to kill, or without premeditation and deliberation, would simply undermine his client's credibility.

The trial court instructed the jury on the charged offense of attempted murder committed with premeditation and deliberation. It also instructed the jury of the lesser crime of attempted voluntary manslaughter—heat of passion.[2]

---

[2]     The record is silent on whether defense counsel requested any jury instructions or objected to any jury instructions.

10

Despite Valdez's argument to the contrary, it was not unreasonable for defense counsel to not request jury instructions on either assault with a deadly weapon (§ 245) or negligent discharge of a firearm (§ 246.3) in light of the defense strategy that Valdez had an alibi that law enforcement failed to investigate. Moreover, assault with a deadly weapon and negligent discharge of a firearm are not lesser included offenses of attempted murder, but rather lesser related offenses. (*People v. Nelson* (2011) 51 Cal.4th 198, 215.) In an attempted murder case, a trial court may properly refuse to instruct a jury on assault with a deadly weapon or negligent discharge of a firearm if the evidence is lacking. (*Ibid.*) Given the evidence in this case, it is doubtful the trial court would have given jury instructions on these lesser related offenses because there was substantial evidence (see sec. II, *post*) that Valdez acted with intent to kill. (*Id.* at pp. 206-207, 215 [trial court properly declined defendant's request to instruct on assault with deadly weapon and negligent discharge of firearm when defendant was charged with attempted murder after firing multiple shots at police officers].)

Although defense counsel could have raised any number of "back-up arguments" to the jury, or asked for jury instructions on lesser related offenses, it is not the appellate court's role to determine if different approaches were available, but, rather, whether the record discloses that defense counsel had no rational tactical reason for the approach he took. (*People v. Fosselman, supra,* 33 Cal.3d at p. 581.) In reviewing this appellate record, there is an explanation for defense counsel's decision to argue the evidence consistent with his client's testimony and alibi. As such, it cannot be said that defense counsel's trial strategy resulted in ineffective assistance even though Valdez now questions that strategy in hindsight and calls it unreasonable. (*People v. Mendoza Tello, supra,* 15 Cal.4th at p. 266 [appellate court considers whether record contains any explanation for counsel's actions].)

Just as importantly, Valdez cannot establish it was reasonably probable a different outcome would have resulted had defense counsel made "back-up arguments" or requested jury instructions on other lesser related offenses. This was not a case with "scant evidence" of specific intent to kill as Valdez argues. To the contrary, substantial evidence supports the jury's finding that Valdez acted with intent to kill. (See sec. II, *post.*) The evidence of guilt was strong and the option of the lesser crime of attempted voluntary manslaughter was presented to and rejected by the jury. In addition, the jury was presented with, and rejected, the option of finding Valdez guilty of attempted murder without premeditation and deliberation. As such, Valdez cannot show that he was prejudiced by defense counsel's actions. This is true even when the "cumulative impact" of those actions are weighed, as Valdez urges.

Defense counsel's actions do not undermine confidence in the outcome of this trial. (*Strickland v. Washington, supra,* 466 U.S. at p. 694.) Thus, Valdez's convictions will not be reversed.

C.     Defense Counsel's Closing Argument

Valdez asserts that defense counsel's closing argument was "jumbled and confused" and a "mishmash." He raises numerous contentions, each discussed below, attempting to show that his counsel's closing argument deprived him of effective assistance of counsel because it was objectively unreasonable.

The right to effective assistance of counsel extends to closing arguments, the purpose of which is for counsel to sharpen and clarify the issues the jury must decide. (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5; *Herring v. New York* (1975) 422 U.S. 853, 862.) The decision of how to argue to the jury after the presentation of evidence is inherently tactical, and judicial review of a defense attorney's summation is highly deferential. (*Yarborough v. Gentry, supra,* at p. 6; *People v. Freeman* (1994) 8 Cal.4th 450, 498.) Closing argument is both an art and a science, and counsel must establish as

12

much credibility with the jury as possible in order to persuade them.  (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1251.)

To prevail on a claim that counsel's concessions during closing argument constituted ineffective assistance, a defendant must overcome the strong presumption that counsel's actions were sound trial strategy under the circumstances prevailing at trial. (*People v. Freeman, supra,* 8 Cal.4th at p. 498.)  Where the incriminating evidence was strong and counsel offered some other choice in the defendant's favor, concessions in closing argument do not constitute ineffective assistance.  (*People v. Hart* (1999) 20 Cal.4th 546, 631.)

"Reversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense. [Citation.]"  (*People v. Moore* (1988) 201 Cal.App.3d 51, 57.)  But where evidence of the defendant's guilt is overwhelming, no prejudice is suffered.  (*People v. Avena* (1996) 13 Cal.4th 394, 422-423.)

### 1.     *Defense Counsel Neglected Legal Definitions*

Valdez argues that defense counsel neglected the legal definitions and failed to attack the prosecution's case in the context of the elements of the charged crimes and the enhancements.  He asserts that counsel did not identify the elements of attempted murder, the legal definition of premeditation, or describe the elements of the other charges and enhancements.

As discussed above, however, defense counsel could have reasonably decided as a matter of tactics to not emphasize the elements of attempted murder or premeditation and, instead, support Valdez's testimony and alibi.  Indeed, in his closing arguments, defense counsel reminded the jury that Valdez informed law enforcement he was elsewhere at the time of the shooting and counsel noted that law enforcement failed to investigate

13

Valdez's alibi. Defense counsel also argued that Seaman was present during the shooting but he was never questioned or interviewed. The convictions will be affirmed because defense counsel had a rational tactical approach. (*People v. Fosselman, supra,* 33 Cal.3d at p. 581.)

Moreover, the trial court instructed the jury on the law and gave the elements of each of the charged crimes and the enhancements, as was the court's duty. (§§ 1093, subd. (f), 1127.) Thus, it is not reasonably probable that a different result would have occurred had defense counsel acted as Valdez now urges. (*Strickland v. Washington, supra,* 466 U.S. at p. 694.)

### 2. *Defense Counsel Misstated Certain Facts*

Valdez next asserts that defense counsel incorrectly stated certain facts during closing argument, such as Lonero ran to assist Ince while Valdez was still present and all of the witnesses testified that there were multiple shots fired.

Valdez is correct that defense counsel misstated these facts during closing argument. Lonero testified that he went to assist Ince after Valdez left. Further, Lonero testified that it sounded to him like only a single shot was fired. In addition, Ince was not asked, and did not testify, regarding the number of shots fired at him.

However, these factual mistakes were not prejudicial. The trial court instructed the jury that nothing the attorneys said in their opening statements or closing arguments was evidence. (CALCRIM No. 222.) It is presumed that the jury followed the trial court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) It is also presumed that the jurors relied on their own recollections of the evidence.

Substantial evidence established that Valdez acted with intent to kill. (See sec. II, *post*.) Three of the witnesses (Dillon Bowen, Brandon Bowen and Eastep) all testified that multiple shots were fired. Given the substantial evidence, it cannot be shown that it was reasonably probable a different outcome would have resulted had defense counsel

14

argued that Lonero testified only a single shot was fired. Likewise, it is immaterial that defense counsel incorrectly stated Lonero ran to assist Ince while Valdez was still present. Valdez cannot show that he was prejudiced by defense counsel's misstatement of these facts. (*Strickland v. Washington, supra,* 466 U.S. at p. 694.) This argument has no merit.

### 3. Defense Counsel Failed to Focus on Witness Inconsistencies

Valdez next contends that defense counsel promised to point out the inconsistencies within the witnesses' testimony but was then "sorely deficient." Valdez asserts that defense counsel focused on the counts dealing with dissuading a witness, which was not as important as the attempted murder charge.

Defense counsel, however, dealt with the attempted murder charge in the closing argument. He reminded the jury that Valdez testified he was elsewhere at the time of the shooting and noted that law enforcement failed to investigate the alibi. Defense counsel also argued that Seaman was present during the shooting but he was never questioned or interviewed. It cannot be said that defense counsel's argument had no rational purpose because the incriminating evidence was strong but counsel offered an alternative choice in Valdez's favor. (*People v. Hart, supra,* 20 Cal.4th at p. 631; *People v. Fosselman, supra,* 33 Cal.3d at p. 581.)

Further, defense counsel did point out inconsistencies in the evidence regarding the number of shots fired. He highlighted that law enforcement found no forensic evidence of multiple shots fired, and he questioned the veracity of the witnesses' testimony in that regard. He also argued that Lonero's pretrial statement that he saw Valdez "picking up bullet casings" was not reasonable. The convictions will be affirmed because defense counsel had a rational tactical approach in defending Valdez. (*People v. Fosselman, supra,* 33 Cal.3d at p. 581.)

15

### 4. Defense Counsel Confused the Victims in Counts 2 and 3

Valdez correctly points out that defense counsel mixed up the victims in counts 2 and 3 and incorrectly told the jury that they were Brandon Bowen and Eastep. The two victims were Dillon Bowen and Eastep. Valdez contends counsel's actions were objectively unreasonable.

The trial court, however, instructed the jury that nothing the attorneys said in their opening statements or closing arguments was evidence. (CALCRIM No. 222.) It is presumed that the jury followed the trial court's instructions. (*People v. Holt, supra,* 15 Cal.4th at p. 662.) Moreover, the trial court instructed the jury that the victims in counts 2 and 3 were "Dillon Bowen" and "Nathan Eastep" and the prosecutor explained in his arguments that "D.B." was Dillon Bowen and "N.E." was Nathan Eastep. Finally, the verdict forms listed "Dillon Bowen" as the victim of count 2 and "Nathan Eastep" as the victim in count 3.

It is not reasonably probable that the result would have been different had defense counsel correctly stated these victims' names. (*Strickland v. Washington, supra,* 466 U.S. at p. 694.)

### 5. Defense Counsel Did Not Accurately Define "Premeditation"

Finally, Valdez maintains that defense counsel gave an incorrect definition of "premeditation" when he suggested the basis for the prosecutor's premeditation allegation was that Valdez "kept shooting. That's why it's premeditated." Valdez contends that the law's definition of premeditation does not equate to "adding up a number of shots fired or blows struck" but is based on a "preexisting reflection" or "considered beforehand as opposed to a rash impulse." (See *People v. Pride* (1992) 3 Cal.4th 195, 247.)

The trial court, however, instructed the jury on the legal definition of "premeditation" and it is presumed the jury followed the court's instructions. (*People v.*

16

*Holt, supra,* 15 Cal.4th at p. 662.)  Moreover, as discussed in sections II and III, *post*, there was substantial evidence that Valdez acted with intent to kill, and with premeditation and deliberation.  Thus, Valdez cannot establish it was reasonably probable a different outcome would have resulted had defense counsel given a hornbook definition of "premeditation" to the jury in his closing argument, after the court defined the law.

In viewing all of defense counsel's actions, including his conduct during closing argument, Valdez cannot show he was prejudiced even when the "cumulative impact" of those actions is weighed.  Defense counsel's actions, either taken individually or collectively, do not undermine confidence in the outcome of this trial.  (*Strickland v. Washington, supra,* 466 U.S. at p. 694.)  Therefore, Valdez cannot establish he was deprived of the benefit of effective assistance of counsel.

## II.    SUBSTANTIAL EVIDENCE SUPPORTS SPECIFIC INTENT TO KILL AND PREMEDITATION

Valdez argues the evidence was insufficient to prove he specifically intended to kill Ince, a necessary element of attempted murder.  He maintains that he only had an intent to scare or harass.  Valdez relies on *People v. Smith* (2005) 37 Cal.4th 733 (*Smith*) and *People v. Leon* (2010) 181 Cal.App.4th 452 (*Leon*) to support his assertion that his due process rights were violated and his conviction for attempted murder must be reversed.

In addition, Valdez asserts that the evidence was insufficient to support the finding that the attempted murder was premeditated and deliberate.  He contends that there was "scant evidence" of planning or motive to kill, and the manner of how the weapon was fired undercuts the evidentiary sufficiency of premeditation.

### A.    Standard of Review for Substantial Evidence

California law is well settled regarding the review for substantial evidence to support a criminal conviction.  The appellate court reviews the entire record in the light

most favorable to the judgment to determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt based on "'evidence that is reasonable, credible, and of solid value.'" (*People v. Jones* (2013) 57 Cal.4th 899, 960, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

In doing its review, the appellate court is not required to ask whether it believes the trial evidence established guilt beyond a reasonable doubt. (*People v. Johnson, supra,* 26 Cal.3d at p. 576.) Rather, the issue is whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence favorably for the prosecution. (*Ibid.*) The appellate court is to presume the existence of any fact the jury could have reasonably deduced from the evidence in support of the judgment. (*People v. Clark* (2011) 52 Cal.4th 856, 943, citing *People v. Davis* (1995) 10 Cal.4th 463, 509.)

B.     Analysis of "Intent to Kill"

For a defendant to be convicted of attempted murder, the prosecution must prove that the defendant had a specific intent to kill and the defendant committed a direct but ineffectual act toward accomplishing the intended killing. (*Smith, supra,* 37 Cal.4th at p. 739; see §§ 187, subd. (a), 664.) The mental state required for attempted murder is different from that required for murder itself, which does not require the intent to kill because implied malice--a conscious disregard for life--is sufficient. (*Smith*, *supra,* at p. 739.) As such, for Valdez to be convicted of the attempted murder of Ince, the prosecution had to prove he acted with specific intent to kill Ince. (*Ibid.*)

"[A]n intent unlawfully to kill" and "express malice" are essentially the same concepts. (*People v. Saille* (1991) 54 Cal.3d 1103, 1114.) To be guilty of attempted murder of Ince, Valdez had to harbor express malice toward him. (*Smith, supra,* 37 Cal.4th at p. 739, citing *People v. Swain* (1996) 12 Cal.4th 593, 604-605.) Express malice requires a showing that the defendant either desired the result of death or knew to

18

a substantial certainty that death would occur. (*Smith, supra,* at p. 739, citing *People v. Davenport* (1985) 41 Cal.3d 247, 262.)

Neither murder nor attempted murder requires proof of motive. (*Smith, supra,* 37 Cal.4th at p. 740.) However, "evidence of motive is often probative of intent to kill." (*Id.* at p. 741.) It is also well established that the defendant's actions and the circumstances of the case can be used to infer the mental state required to convict the defendant of attempted murder. (*Ibid.*, citing *People v. Lee* (1987) 43 Cal.3d 666, 679.)

The act of firing a gun toward a victim at a close, but not point blank, range is sufficient to support an inference of intent to kill where the shot could have inflicted a mortal wound had the shot been on target. (*Smith, supra,* 37 Cal.4th at p. 741, citing *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) The fact that a defendant may have stopped firing after his first shot and then abandoned his efforts due to fear does not establish he lacked the intent to kill. (*Smith*, *supra,* at p. 741.) In addition, the fact that the victim may have lived because of the defendant's poor marksmanship does not establish a less culpable state of mind. (*Ibid.*)

Here, Ince's testimony alone provides substantial evidence to support the jury's verdict that Valdez acted with intent to kill. Ince testified that Valdez approached the porch with the rifle and then pointed it at him. Valdez then fired and struck Ince in the right side of his chest. Valdez's actions imply intent to kill because he aimed his rifle at Ince's upper body and fired. Had Valdez's shot been on target, the shot could have inflicted a mortal wound. The fact that Ince may have lived due to Valdez's poor marksmanship does not establish a less culpable state of mind. Valdez's actions display an express malice because it can be reasonably inferred that he either desired Ince's death or knew to a substantial certainty that death would occur when he aimed the rifle at Ince's torso and fired. (*Smith, supra,* 37 Cal. 4th at p. 739.)

19

Valdez argues that only one shot was fired so that, under the totality of the evidence, Valdez could not have had a specific intent to kill. Valdez points to Ince's and Lonero's testimony, and to the lack of evidence at the crime scene, as showing a "reasonable inference" that only a single shot was fired. Respondent counters that Valdez fired more than a single shot as multiple witnesses testified and/or told law enforcement at the scene that Valdez fired multiple times. We need not decide on how many shots Valdez actually fired to resolve this issue because a single shot is sufficient to establish intent to kill. (*Smith, supra,* 37 Cal.4th at p. 741.) There was substantial evidence that Valdez fired at least one time at Ince. The jury could reasonably determine that Valdez had intent to kill when he aimed the rifle at Ince's torso and fired. (*Ibid.*)

Valdez's argument is also without merit that he did not have intent to kill because he did not fire the rifle at "point blank range" but near his truck, which a police officer estimated may have been as great as 40 to 50 feet away from where Ince stood. The law, however, does not require a showing of "point blank range" to support a conviction of attempted murder for firing a gun. (*Smith, supra,* 37 Cal.4th at p. 741.) Instead, "close range" is sufficient where the shot could have inflicted a mortal wound had the shot been on target. (*Ibid*.)

The jury had substantial evidence to determine that Valdez fired the rifle at close range and not from his truck. Ince testified that Valdez "approached [him] with the gun and he shot me." Dillon Bowen also testified that Valdez walked back to his truck, grabbed a rifle and walked back around the truck and then he shot. Dillon Bowen stated that when Valdez shot he was "just down the steps down the porch[]" and Ince was standing on the porch in front of his door. Also, Eastep testified that Valdez walked back towards Ince with the rifle before he pointed it at Ince and shot. This was substantial evidence to support a conviction for attempted murder. (*People v. Lashley* (1991) 1

20

Cal.App.4th 938, 945 [substantial evidence supported attempted murder conviction where defendant fired single shot from a .22-caliber rifle from second story balcony].)

Valdez also maintains that Ince "accidentally" leaned into the shot, establishing that Valdez did not actually put Ince in the line of fire. Valdez's argument, however, is not supported by Ince's testimony, when he told the jury that he "leaned to the right so I could take the shot in my right side, because I knew it was coming." Ince's testimony shows he was in the line of fire because he moved to take the shot on his right side. Even if Ince's testimony can be interpreted more than one way, the circumstances reasonably justified the jury's finding so the judgment will not be reversed. (*People v. Abilez* (2007) 41 Cal.4th 472, 504 [opinion of reviewing court that circumstances might also reasonably be reconciled with a contrary finding of the jury does not warrant reversal of judgment].) The jury was well within its right to use Ince's testimony as establishing Valdez placed Ince in the line of fire and intended to kill him. (*Smith, supra,* 37 Cal.4th at p. 741.)

Finally, Valdez's reliance on *Leon, supra,* 181 Cal.App.4th 452, is misplaced. In *Leon*, the defendant fired a single shot into the right taillight of a car that held three occupants. Once of the occupants was struck and killed. The defendant was convicted of one count of murder and two counts of attempted murder. (*Id.* at pp. 456-458.) Two of the occupants were seated on the passenger side, with one occupying the front seat and the other the rear seat. The third occupant was the driver. (*Id.* at p. 457.) The shot went through the taillight and back seat, and killed the back seat passenger. (*Id.* at pp. 457-458.) The *Leon* court held that the evidence was sufficient to support the finding of intent to kill the two victims seated on the passenger side of the vehicle, one behind the other, because they were in the defendant's line of fire, but the evidence was insufficient to show intent to kill the driver, who was not in the line of fire from the single shot. (*Id.* at pp. 465-466.) The court noted that it was "physically impossible" for the single bullet to strike the driver as well as the other two victims. (*Id.* at p. 465.)

21

Here, substantial evidence supports that Valdez fired a shot at Ince at close range because Valdez walked towards Ince after getting his rifle from his truck and prior to shooting. Also, substantial evidence supports that Ince was in the line of fire because he "leaned to the right so [he] could take the shot in [his] right side, because [he] knew it was coming." It was physically possible for Valdez's shot to strike Ince even before Ince moved. As such, *Leon* is distinguishable.

Likewise, Valdez's attempt to distinguish *Smith, supra,* 37 Cal.4th 733, is misplaced. In *Smith*, the defendant fired a single shot into the rear of a vehicle from a distance of one car's length away. Two victims were in the car and in the line of fire. The defendant was convicted of attempted murder of both victims despite firing a single shot. The *Smith* court upheld the defendant's conviction for attempted murder against a substantial evidence challenge. The *Smith* court emphasized that both victims were in the line of fire and the shot was discharged from close range. (*Id.* at p. 743.) Given the facts of this case, *Smith* supports affirming Valdez's conviction for attempted murder because Ince was in the line of fire and Valdez discharged the shot from close range.

Substantial evidence supports the jury's verdict that Valdez had a specific intent to kill Ince when Valdez aimed the rifle at Ince's torso and fired. (*Smith, supra,* 37 Cal.4th at p. 741.) This evidence was reasonable, credible, and of solid value such that a reasonable jury could find Valdez guilty beyond a reasonable doubt. (*People v. Jones, supra,* 57 Cal.4th at p. 960; *People v. Johnson, supra,* 26 Cal.3d at p. 576.) Accordingly, Valdez's conviction in count 1 is affirmed.

C.    Analysis of "Premeditation"

Premeditation and deliberation exist when the attempted killing occurred as a result of preexisting reflection rather than an "unconsidered or rash impulse." (*People v. Bolin* (1998) 18 Cal.4th 297, 332.) In the context of first degree murder, "'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or

22

determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.)

The Supreme Court utilizes three categories of evidence to resolve the issue of premeditation and deliberation: planning activity, motive, and manner of killing. (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) These factors do not require a "special combination" and they are not accorded any particular weight, but these factors are a guide for an appellate court to assess whether the evidence supports an inference that a killing or attempted killing occurred because of preexisting reflection. (*People v. Bolin, supra,* 18 Cal.4th at pp. 331-332.) The appellate court will uphold an attempted murder verdict when there is (1) extremely strong evidence of planning, or (2) evidence of motive coupled with either (a) evidence of planning or (b) evidence of a manner of killing showing that the defendant must have had a preconceived design. (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.)

While premeditation and deliberation do not require an extended period of time, the test is not the duration of time so much as the extent of reflection. (*People v. Bloyd, supra,* 43 Cal.3d at p. 348.) The essence of premeditation and deliberation is a cold calculated judgment rather than a rash impulse. (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.) The Supreme Court has cautioned, however, that if "deliberation" and "premeditation" meant no more reflection than that involved in forming intent to kill, then there would be no distinction between attempted murder, and attempted premeditated and deliberate murder. (*People v. Anderson* (1968) 70 Cal.2d 15, 26.)

Here, substantial evidence established that Valdez had a motive to kill Ince. Valdez and Ince engaged in an argument after Ince told Valdez he was no longer welcome at the Ince home over concerns Valdez had tried to steal marijuana plants. Ince and Valdez's argument before the attempted murder is sufficient to support an inference that anger motivated Valdez to kill. (*People v. Bloyd, supra,* 43 Cal.3d at pp. 342-343,

23

348.) Valdez argues that his disagreement with Ince over the marijuana plants "hardly supports a motive to kill." However, a motive to kill need not be rational and even shallow anger at how Ince spoke to Valdez may be a motive for murder. (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102.)

As to planning, substantial evidence also exists that Valdez did more than act on a rash impulse. Valdez drove to Ince's house with a loaded rifle in his truck. This is circumstantial evidence that Valdez had considered the possibility of a violent encounter. (*People v. Lee* (2011) 51 Cal.4th 620, 636; *People v. Alcala* (1984) 36 Cal.3d 604, 626, abrogated by statute on other grounds as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911 ["when one ... brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset"].)

After arguing with Ince, Valdez returned to his truck, obtained the rifle, and then walked back towards Ince before aiming the rifle and firing. One witness even testified that Valdez backed the truck out of the driveway and then positioned it so that it was "facing into the road" before obtaining his rifle. This was substantial evidence for the jury to determine that Valdez acted on more than just a rash impulse. (*People v. Bolin, supra,* 18 Cal.4th at p. 332.) Although the record does not suggest that it took Valdez a significant period of time to retrieve his rifle and walk back towards Ince, premeditation and deliberation do not require an extended period of time, and cold, calculated judgment can occur quickly. (*Id.* at pp. 331-332.)

Valdez argues that his actions only show a "sudden burst of anger" after he argued with Ince because he did not have the rifle on his person when he first spoke with Ince but had to return to retrieve it, thereby suggesting a "sudden unplanned and impulsive decision to fire in a fit of passion." The jury, however, was given the opportunity to find Valdez guilty of attempted voluntary manslaughter (heat of passion), which it rejected. Based on this record, the jury could have reasonably determined that Valdez acted with

24

more than a sudden burst of anger when, instead of shooting Ince during their argument, he walked away from Ince, returned to his truck, retrieved the rifle, and then walked back to shoot Ince.

As to the manner of the attempted killing, Valdez again asserts that the evidence infers only a single shot was fired, "thereby suggesting an unconsidered and hastily conceived rash impulse to scare or frighten" Ince. However, even a single shot aimed at a vital area of the victim's body at close range is evidence of deliberation. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1082.)

Respondent again urges that the evidence establishes that multiple shots were fired. In viewing the evidence in the light most favorable to the verdict, the jury had substantial evidence to determine that Valdez fired more than once at Ince. The manner of the attempted killing shows that Valdez acted deliberately to bring about Ince's death.

Finally, Valdez cites *People v. Boatman* (2013) 221 Cal.App.4th 1253 (*Boatman*)[3] as support that there is insufficient evidence to find premeditation. The facts of *Boatman*, however, are very different from those presented here.

In *Boatman,* the defendant shot his girlfriend in her face while they were in a bedroom of his family's home. (*Boatman, supra,* 221 Cal.App.4th at p. 1258.) There were other family members in the home at the time, but none of them witnessed the shooting. The defendant gave different versions of what happened. He initially told

---

[3]     Via letter dated September 22, 2014, Valdez submitted *Boatman* as supplemental authority asserting that *Boatman* was decided after the November 5, 2013, mailing of Valdez's reply brief. *Boatman* was published on December 4, 2013. As a general proposition, points raised after the opening brief will not be considered unless good cause is shown for failure to present them earlier. (*People v. Adams* (1990) 216 Cal.App.3d 1431, 1441, fn. 2; *People v. Jackson* (1981) 121 Cal.App.3d 862, 873.) Given *Boatman*'s publication date, Valdez has shown good cause. (*Meier v. Ross General Hospital* (1968) 69 Cal.2d 420, 423, fn. 1.) Accordingly, we will consider *Boatman*.

25

officers that his girlfriend accidentally shot herself. He then stated that he accidentally shot her thinking the gun was not loaded. His final story was that he knew the gun was loaded and his girlfriend playfully pointed it at him, he slapped it away, and he then cocked back the hammer "'just jokingly'" and the gun fired after the hammer slipped. (*Id.* at p. 1259.) At trial, however, he testified that she playfully pointed the gun at him and he took it and playfully pointed it back at her. While pointing it at her, he cocked back the hammer, and, when she slapped the gun, it discharged. (*Id.* at p. 1260.) Immediately after the shooting, the defendant asked his brother to call the police and he attempted to give his girlfriend mouth-to-mouth resuscitation. (*Ibid.*)

The *Boatman* court concluded that there was no planning evidence presented. (*Boatman, supra,* 221 Cal.App.4th at p. 1267.) The court pointed out that there was "no evidence that defendant left the room or the house to get a gun, or that he even moved from his squatting position on the floor." (*Ibid.*) The court further reasoned that the "[d]efendant's behavior following the shooting [was] of someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan," noting that he tried to resuscitate his girlfriend, told his brother to call the police, and could be heard crying in the background during the 911 call. (*Ibid.*) The court concluded that "[t]he evidence not only fails to support an inference of a plan to kill [his girlfriend], but strongly suggests *a lack* of a plan to kill." (*Ibid*, original italics.)

The *Boatman* court also found "little or no relevant motive evidence." (*Boatman, supra,* 221 Cal.App.4th at p. 1267.) The only motive evidence was a text message from the victim to a friend, stating that she was having a fight with the defendant. The Attorney General relied on this to argue that the jury may have inferred that the defendant was "'in a bad mood after being released from custody and he was angry with [his girlfriend].'" (*Id.* at pp. 1267-1268.)

26

Here, unlike in *Boatman,* substantial evidence establishes that Valdez walked away from Ince in order to retrieve his loaded rifle, giving him time to premeditate and deliberate before he returned and fired. Further, unlike in *Boatman*, substantial evidence establishes that Valdez had a motive to kill Ince following their argument and dispute over the marijuana crop. Finally, unlike in *Boatman*, there is no evidence that Valdez's behavior following the shooting was of someone horrified and distraught about what he had done. Instead of trying to give aid to Ince or having authorities summoned, as the defendant did for his girlfriend in *Boatman*, Valdez fled the crime scene. Indeed, the jury even heard testimony that, before fleeing, Lonero witnessed Valdez "picking up objects from the ground in front of [Ince's] residence" and, although Lonero was not sure what those objects were, it "may have been spent shell casings from the rifle that [Valdez] had fired." Unlike in *Boatman*, Valdez's actions after the shooting were those of someone who had just fulfilled a preconceived plan. (*Boatman, supra,* 221 Cal.App.4th at p. 1267.) *Boatman* is distinguishable and does not support Valdez's argument.

When the Supreme Court's three factors are analyzed, substantial evidence supports an inference that the attempted killing occurred because of Valdez's preexisting reflection. (*People v. Bolin, supra,* 18 Cal.4th at p. 332.) This evidence was reasonable, credible, and of solid value such that a reasonable jury could find that Valdez intended to kill Ince with deliberation and with premeditation. (*People v. Jones, supra,* 57 Cal.4th at p. 960.) Accordingly, Valdez's conviction in count 1 is affirmed.

III. VALDEZ GAVE VOLUNTARY AND INTELLIGENT ADMISSIONS TO THE THREE PRIOR PRISON TERM ENHANCEMENTS UNDER SECTION 667.5, SUBDIVISION (B)

Valdez argues that he did not voluntarily and intelligently admit the three prior prison term enhancements under section 667.5, subdivision (b). As a result, Valdez urges

27

that this matter should be remanded for retrial of these prior conviction allegations. We disagree.

A.    Background

On the first day of trial, but before the jury was sworn, the following exchange took place between the court, defense counsel (Mr. Bianco), the prosecutor (Mr. Rodriguez), and Valdez.

> "THE COURT:    [Valdez] matter.
>
> "MR. BIANCO:    Yes. We talked about this procedurally in chambers. There are special allegations on all three counts in which the District Attorney has alleged a prior felony for purposes of the jury not hearing the specifics about those prior felonies and limiting their understanding of [Valdez's] record that he's been convicted of felony crimes of moral turpitude. He would be admitting special allegations of the prior felony in case ... 40793, 520342 and 135783. I believe it's just those three.
>
> "MR. RODRIQUEZ:    Right.
>
> "THE COURT:    Those are the three. They're all from Tulare County. Each of those adds an additional year should you be found guilty of any of these three crimes. Do you understand that?
>
> "[VALDEZ]:    Yes.
>
> "THE COURT:    By admitting those now you're going to be giving up your right to have the jury decide that issue. You'd also have the right to testify, but nobody could force you to do so regarding those matters, but nobody could force you to do so. You'd have the right to subpoena witnesses into court at no expense to you, and the right to cross-examine and confront witnesses that might be called against you.
>
> "[VALDEZ]:    What do you mean by admitting them? Am I getting time for that?
>
> "THE COURT:    Only if you're convicted of one of those three crimes.

28

"[VALDEZ]:         All right.

"THE COURT:       You understand those rights, then?

"[VALDEZ]:         Yes.

"THE COURT:       Do you give up those rights?

"[VALDEZ]:         Yes.

"THE COURT:       Okay.  Pursuant to 667.5(b) that you suffered a conviction in court case 40793 for a violation of Vehicle Code Section 10851 on July 15, 1998, out of Tulare County?

"[VALDEZ]:         Yes, sir.

"THE COURT:       And also case CRF 00520342, for a violation of Health and Safety Code Section 11377, conviction date February 4, 2000, out of Tulare County?

"[VALDEZ]:         Yes, sir.

"THE COURT:       And also VCF 135783 for a violation of Health and Safety Code Section 11359, conviction date March 18, 2005, out of Tulare County.

"[VALDEZ]:         Yes, sir."

B.     Standard of Review

The trial court must ensure that a defendant who wishes to admit a prior conviction first receives a *Boykin-Tahl*[4] advisement about his or her rights and obtain waivers regarding (1) the right to a trial to ascertain the fact of the prior conviction; (2) the right to remain silent; and (3) the right to confront adverse witnesses.  (*In re Yurko* (1974) 10 Cal.3d 857, 863; *People v. Mosby* (2004) 33 Cal.4th 353, 356 (*Mosby*).)  Advisement and waiver of these rights are necessary to establish a defendant's voluntary

_____

[4]     *Boykin v. Alabama* (1969) 395 U.S. 238 and *In re Tahl* (1969) 1 Cal.3d 122 (*Boykin-Tahl*).

29

and intelligent admission to a prior conviction. (*Mosby, supra,* at p. 356; *People v. Howard* (1992) 1 Cal.4th 1132, 1178-1179.)

When the *Boykin-Tahl* advisement is defective, the appellate court must remand unless the record affirmatively shows the waiver was "'voluntary and intelligent under the *totality of the circumstances*.'" (*Mosby, supra,* 33 Cal.4th at p. 360, quoting *People v. Howard, supra,* 1 Cal.4th at p. 1175.) The entire proceeding, not just the plea colloquy, is reviewed. (*Mosby, supra,* at p. 361.)

The Supreme Court divides defective plea advisements into two categories: (1) silent record cases, and (2) cases of incomplete *Boykin-Tahl* advisements. (*Mosby, supra,* 33 Cal.4th at pp. 361-362.) Silent record cases must be remanded because the appellate court cannot infer a voluntary and intelligent waiver from the record. (*Id.* at p. 362.) "Truly silent-record cases are those that show no express advisement or waiver of the *Boykin-Tahl* rights before a defendant's admission of a prior conviction." (*Id.* at p. 361.) Conversely, cases in the incomplete advisement category can be affirmed if the record affirmatively shows voluntary and intelligent waiver. (*Id.* at p. 365; see *People v. Howard, supra,* 1 Cal.4th at p. 1180.)

C.    Analysis

Here, Valdez does not contend, and we do not find, that this is a "silent record" case requiring remand. On the contrary, the trial court admonished Valdez that by admitting the priors "you're going to be giving up your right to have the jury decide that issue. You'd also have the right to testify, but nobody could force you to do so regarding those matters, but nobody could force you to do so. You'd have the right to subpoena witnesses into court at no expense to you, and the right to cross-examine and confront witnesses that might be called against you." In so doing, the trial court adequately informed Valdez of his right to a jury trial, his right to testify, that nobody could force him to testify, his right to subpoena witnesses, and his right to cross-examine and

30

confront witnesses.  This was done prior to receiving Valdez's admissions on the priors. These advisements were proper and satisfied the standard set forth by the Supreme Court. (*Mosby, supra,* 33 Cal.4th at p. 356.)

Valdez, however, argues that under the totality of the circumstances, he did not give proper waivers.  He raises a series of concerns, set forth below, which are unconvincing when viewed individually or collectively.

### 1.    *The Court Gave a Satisfactory Advisement on the Trial Right*

Valdez first asserts that the trial court's advisements on his right to trial was defective because the trial court "alluded to the jury trial right" but failed to inform him "that he also had a right to a court trial on the prison priors."   Valdez, however, cites no authority holding an admonishment is defective where the trial court only mentions a right to a trial by jury and fails to advise the defendant of the right to a court trial.

To the contrary, the Supreme Court, in fashioning the *Boykin-Tahl* advisements, held that "each of the three rights mentioned--self-incrimination, confrontation, and *jury trial*--must be specifically and expressly enumerated for the benefit of and waived by the accused" before a guilty plea could be accepted.  (*In re Tahl, supra,* 1 Cal.3d at p. 132, italics added.)

Five years after *In re Tahl*, the Supreme Court extended the three *Boykin-Tahl* admonitions and required them to be given before a court accepts a defendant's admission that he had prior felony convictions.  (*In re Yurko, supra,* 10 Cal.3d 857, 863.) At no time has the Supreme Court expanded the *Boykin-Tahl* advisements to require advisement to the accused on the right to a court trial in the alternative to a jury trial.  The trial court's express advisement to Valdez that he had the right to a jury trial satisfies the *Boykin-Tahl* line of cases.  (*Mosby, supra,* 33 Cal.4th at pp. 359-360.)

31

*2.    The Court Adequately Advised on the Right to Not Testify*

Valdez next contends that the trial court's advisement regarding his right against self-incrimination was defective because it was "confusing and incomplete" and did not correctly inform him of the "crux" of his right against self-incrimination.

The trial court, however, made it clear Valdez could not be forced to testify, which is the "crux" of his right against self-incrimination.  (U.S. Const., 5th Amend. ["[n]o person . . . shall be compelled in any criminal case to be a witness against himself …."]; see *People v. Tom* (2014) 59 Cal.4th 1210, 1222-1223.)

Valdez's argument is without merit.

*3.    All of the Elements Are Deemed Admitted*

Valdez maintains that the trial court did not advise, and he did not admit, all of the elements of the section 667.5, subdivision (b), enhancements[5], demonstrating that his admission was not intelligent and voluntary under the totality of the circumstances. Valdez cites *People v. Epperson* (1985) 168 Cal.App.3d 856 (*Epperson*) in support. However, Valdez's argument and legal authority are not persuasive.

In *Epperson*, the defendant admitted only the fact of each prior conviction but not the existence of the requisite prison term served or the nonexistence of the five-year "washout" period under section 667.5, subdivision (b).  (*Epperson, supra,* 168 Cal.App.3d at p. 864.)  The *Epperson* court declined to view defendant's admissions of the "convictions" as including admissions of all the necessary elements under section 667.5, subdivision (b).  (*Epperson, supra,* at pp. 864-865.)  The *Epperson* court, however,

---

[5]    Imposition of a sentence enhancement under section 667.5 requires proof that the defendant (1) was previously convicted of a felony; (2) was imprisoned as a result of that conviction; (3) completed that term of imprisonment; and (4) did not remain free for five years of both prison custody and the commission of a new offense resulting in a felony conviction.  (§ 667.5, subd. (b); *People v. Tenner* (1993) 6 Cal.4th 559, 563.)

noted that the government conceded at oral argument that the defendant had not reoffended within the required five-year period, and striking the enhancement was therefore proper. (*Id.* at p. 865.) The *Epperson* court then agreed that modification of defendant's sentence was proper. (*Ibid.*)

In contrast, in *People v. Carrasco* (2012) 209 Cal.App.4th 715 the defendant admitted only the fact of the prior convictions and not the additional facts that he served separate prison terms for those priors and that he committed a new crime within the five-year "washout" period. (*Id.* at p. 723.) The *Carrasco* court, however, found the defendant's admissions sufficient to encompass both the facts of the convictions and the elements of the enhancements because the facts were alleged in the information and the court alluded to them. (*Id.* at p. 724.) At the time of the admission the trial court noted that the priors were "'both state prison priors pursuant to 667.5, subdivision (b).'" (*Ibid.*) The court asked the defendant if he understood that he could be sentenced to serve an additional one year for each of the two state prison priors, and the defendant answered that he did understand, and he then admitted the priors. (*Ibid.*) The trial court then found the prior convictions true "'within the meaning of Penal Code section 667.5, subdivision (b).'" (*Ibid.*) The *Carrasco* court found that under the "totality of the circumstances" the defendant admitted the allegations set forth in the information, which included all of the elements under section 667.5, subdivision (b). (*Carrasco, supra,* at p. 724.)

Here, we agree with *Carrasco* and find *Epperson* unpersuasive. Valdez was charged by information, which specifically alleged that he had suffered three prior convictions for which he had served a prison term and did not remain free of prison custody for, and committed an offense resulting in a felony conviction during, a period of five years subsequent to the conclusion of the term, within the meaning of section 667.5, subdivision (b). At the beginning of the exchange before the admissions, Valdez's trial counsel alluded to the information when he stated that there "are special allegations on all

three counts in which the District Attorney has alleged a prior felony ....'" Valdez's counsel then stated that Valdez "would be admitting special allegations of the prior felony in case ... 40793, 520342 and 135783." The trial court, as in *Carrasco*, then specifically mentioned section 667.5, subdivision (b), in eliciting Valdez's admissions to the allegations of the prior convictions. The trial court also cautioned Valdez that he would receive more time if he was convicted of one of the current crimes.

Under the totality of the circumstances, Valdez admitted the allegations as set forth in the information, which included all the elements under section 667.5, subdivision (b). (*Carrasco, supra,* 209 Cal.App.4th at pp. 724-725; see *People v. Ebner* (1966) 64 Cal.2d 297, 303 ["Defendant's admission of the prior convictions is not limited in scope to the fact of the convictions but extends to all allegations concerning the felonies contained in the information."].)

### 4. *Valdez Understood His Rights*

Valdez next points to his question to the court--"What do you mean by admitting them? Am I getting time for that?"--as evidence his admission was not intelligent and voluntary. We are not persuaded. If anything, Valdez's question, and the court's answer, further shows the subsequent waivers were voluntary and intelligent because Valdez asked about the consequence of admitting the priors and the court confirmed he would receive additional time if he was convicted. Immediately after this exchange, the court then asked Valdez if he understood these rights, and Valdez responded in the affirmative. This exchange only reinforces that Valdez was informed and understood his rights.

### 5. *Valdez's Past Criminal History Is Relevant*

Finally, Valdez stresses that his factual situation differs from the facts in *Mosby* because, unlike in *Mosby*, the trial court's advisements occurred before his jury trial commenced. As such, Valdez reasons that he had no way to understand and appreciate his rights when he entered into his admissions. Further, Valdez contends his criminal

34

history cannot be used to imply he intelligently and voluntarily waived his rights, and he cites *People v. Campbell* (1999) 76 Cal.App.4th 305 (*Campbell*) and *People v. Sifuentes* (2011) 195 Cal.App.4th 1410 (*Sifuentes*). Again, Valdez's contentions have no merit.

In both *Sifuentes* and *Campbell*, the court rejected the prosecution's argument that the defendant's experience and familiarity with the criminal justice system demonstrated that he intelligently and voluntarily waived his rights. (*Campbell, supra,* 76 Cal.App.4th at p. 310; *Sifuentes, supra,* 195 Cal.App.4th at pp. 1420-1421.) However, in both *Campbell* and *Sifuentes*, the trial court gave no admonitions with respect to *any* of the applicable constitutional rights and they were both "silent-record" cases. It was in this context as "silent record" cases that the court rejected the contention it could infer from the defendant's past experience and familiarity with the criminal justice system that the defendant intelligently and voluntarily waived his rights. (*Campbell, supra,* at p. 310; *Sifuentes, supra,* at p. 1421.)

Here, we do not have a "silent record case" and, instead, the trial court gave the required *Boykin-Tahl* admonitions. As such, *Campbell* and *Sifuentes* are distinguishable. As discussed in *Mosby*, Valdez's past criminal history is relevant.

A review of the probation officer's report reveals that Valdez had extensive experience with the criminal justice system with six previous felony convictions, five violations of parole and numerous misdemeanor convictions. Even more telling, the report shows Valdez had a previous prison sentence enhanced for prison priors under section 667.5, subdivision (b). It is logical for us to infer that someone with Valdez's experience in the criminal justice system, even if he had not yet undergone a jury trial, understood his right to a jury trial, to confront the witnesses against him, and his right against compulsory self-incrimination. We thus conclude that, under the totality of the circumstances, Valdez's admissions to the enhancements were made intelligently and

35

voluntarily. The trial court did not err by imposing the one-year prior prison term enhancements.

IV. VALDEZ IS ENTITLED TO 476 DAYS OF PRESENTENCE CUSTODY CREDIT

Valdez argues that he is entitled to additional presentence custody credits so that his total award is 476 days for time actually served (414 days) and local conduct (62 days). Respondent agrees.

The probation report indicates Valdez's actual days of custody were calculated based upon a September 20, 2011, to October 25, 2012, period. Valdez, however, was sentenced on November 6, 2012, and the trial court failed to include the additional days in custody. (*People v. Smith* (1989) 211 Cal.App.3d 523, 526 [actual days of custody run through sentencing date].) September 20, 2011, to the date of sentencing equals 414 days.

Because Valdez was convicted of a violent felony as set forth under section 2933.1, his conduct credits are calculated at the rate of 15 percent. (§ 2933.1.) Fifteen percent of 414 equates to 62 days. As such, Valdez is entitled to 476 total days of presentence credit and the judgment will be so modified.

V. THE ABSTRACT OF JUDGMENT CONTAINS CLERICAL ERRORS

Valdez's final contention is that the abstract of judgment has clerical errors. Once again, respondent agrees.

The jury found Valdez guilty as charged in count 1. The jury found true that in the commission of the attempted murder Valdez personally and intentionally discharged a firearm which proximately caused great bodily injury (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), personally and intentionally used a firearm (§ 12022.53, subd. (b)), and personally inflicted great bodily injury (§ 12022.7, subd. (a)).

36

In accordance with section 12022.53, subdivision (f), the trial court imposed and then stayed three of these four enhancements. (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130.) Specifically, associated with count 1, the court stayed the enhancements under sections 12022.7, subdivision (a), 12022.53, subdivision (b), and 12022.53, subdivision (c). For count 1, the court sentenced Valdez to life with the possibility of parole, plus a consecutive term of 25 years to life for the enhancement pursuant to section 12022.53, subdivision (d).[6]

However, a clerical mistake occurred. The abstract of judgment indicates that the court stayed three enhancements pursuant to section 12022.53, subdivision (d), which must be corrected. The abstract should be amended to reflect that the enhancements were stayed under sections 12022.53, subdivision (b), and 12022.53, subdivision (c). The abstract correctly shows the stayed enhancement pursuant to section 12022.7, subdivision (a). The three stayed enhancements under section 12022.53, subdivision (d), should be stricken from the abstract.

## DISPOSITION

The case is remanded for the trial court to correct the abstract of judgment to show that Valdez had a total of 476 days presentence credits based on 414 days of actual custody and 62 days of conduct credit and to modify the abstract of judgment to reflect the stayed enhancements pursuant to section 12022.53, subdivision (b), and section 12022.53, subdivision (c). The court shall strike the three stayed enhancements pursuant to section 12022.53, subdivision (d).

---

[6] The court also imposed three consecutive terms of one year each for the prior prison term enhancements pursuant to section 667.5, subdivision (b).

The trial court is directed to prepare an amended abstract of judgment to reflect the above changes and to forward the amended abstract of judgment to the appropriate authorities. The judgment is otherwise affirmed.

_____
Franson, J.

WE CONCUR:


_____
Kane, Acting P.J.


_____
Poochigian, J.